**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

CASE NO. 1:19-CV-21736-MORENO/LOUIS

BARBARA E. MESA,

  Plaintiff,

vs.

ANDREW SAUL, Acting Commissioner
 of Social Security Administration,

  Defendant.

_____/

**<u>REPORT AND RECOMMENDATIONS</u>**

   This cause came before the Court on the Parties' cross-motions for summary judgment (ECF Nos. 19, 24). These Motions were referred to the undersigned United States Magistrate Judge by the Honorable Federico A. Moreno, United States District Judge, for a Report and Recommendation (ECF No. 2). Upon consideration of the briefing and the record, and being otherwise fully advised in the premises, the undersigned **RECOMMENDS** that Plaintiff's Motion (ECF No. 19) be **GRANTED** and Defendant's Motion (ECF No. 24) be **DENIED**.

**I. PROCEDURAL BACKGROUND**

   This case involves a redetermination of Plaintiff Barbara E. Mesa's application for social security income ("SSI") under the Social Security Act, 42 U.S.C. § 401, *et seq.* Plaintiff was deemed disabled on March 23, 1990, based on a determination made on June 14, 1995 (R. 155). The determination found that Plaintiff met the degree of severity required by Listing Section 11.02A of the Listing of Impairments for Epilepsy (*id*). Plaintiff was first deemed disabled as a result of an Epilepsy/Seizure disorder -- poorly controlled; small vessel cerebrovascular disease;

1

and obesity (*id*). On July 28, 2005, the Social Security Administration ("SSA") conducted a Continuing Disability Review ("CDR") and found that the claimant's disability continued to meet the degree of severity required by Listing Section 11.02A of the Listing of Impairments and that there was no medical improvement (*id*). Plaintiff continued to receive disability insurance benefits until December 18, 2012, when the SSA determined that she no longer fit the criteria for disability during a CDR (R. 332). She was deemed not disabled for purposes of receiving disability benefits on December 19, 2012 (R. 141). That determination was upheld upon reconsideration after a disability hearing by a State agency Disability Hearing Officer. Plaintiff, thereafter, requested a hearing before an Administrative Law Judge ("ALJ") on July 30, 2013 (R. 166). The hearing occurred in-person on February 3, 2015 (R. 76). After the hearing, the ALJ obtained the opinions of state vocational experts by way of deposition (R. 100).

On June 5, 2015, the ALJ issued her unfavorable decision finding that the Plaintiff was no longer disabled within the meaning of the Act (R. 114). The ALJ determined that the comparison point decision ("CPD"), the most recent favorable medical decision finding that claimant continued to be disabled, was the determination dated July 28, 2005 (R. 118).  At the time of the CPD, Plaintiff had the following medically determinable impairments: seizure disorder, small vessel cerebrovascular disease, and obesity (R. 119). In her decision, the ALJ found that medical evidence supported a finding that as of December 19, 2012, there had been a decrease in medical severity of the impairments present at the time of the CPD (R. 123). The ALJ found this related to Plaintiff's ability to work because, as of December 19, 2012, the Plaintiff's CPD impairment no longer met or medically equaled the same listing that was met at the time of the CPD (*id*). The ALJ acknowledges that as of December 19, 2012, the Plaintiff continued to have a severe impairment or combination of impairments which limited her ability to perform basic work

activities (*id*). However, based on the impairments present as of December 19, 2012, the claimant had residual functional capacity ("RFC") to perform a partial range of light work, with some limitations (*id*).  The ALJ noted that mentally, Plaintiff could understand, remember, and carry out short and simple instructions (*id*). The ALJ further noted that Plaintiff has had no past relevant work and has at least a high school education and is able to communicate in English (R. 129). Considering these factors, the ALJ found that Plaintiff was able to perform a significant number of jobs in the national economy such as: laundry folder, electronics workers, and small parts assembler (*id*). Ultimately, the ALJ concluded that Plaintiff's disability ended as of December 19, 2012 (R. 130).

Plaintiff requested an administrative review of the ALJ's unfavorable decision to the Appeals Council of SSA on the basis of failure to follow the provisions of Social Security Ruling 13-3p that require adjudicating a CDR decision from the date of cessation through the date of the ALJ's decision (R. 138-139). The Appeals Council granted the request, vacated the ALJ's decision and remanded the opinion to the ALJ for further proceedings (R. 137). The ALJ Council found that while the ALJ determined that Plaintiff's disability ended on December 19, 2012 she did not consider whether Plaintiff's disability continued through the date of the decision, in compliance with Social Security Ruling 13-3p (R. 138). The ALJ conducted a second hearing on December 4, 2017, and on June 6, 2018, rendered an unfavorable decision (R. 29). Plaintiff's request for review of the ALJ's decision was denied by Appeals Council on April 19, 2019 (R. 1). This decision became the Commissioner's final decision on the issue. Plaintiff now seeks judicial review of the ALJ's decision in this case. Plaintiff has exhausted her administrative remedies and, as such, this case is ripe for review under 42 U.S.C. § 1383(c).

## II.   STANDARD OF REVIEW

### 1.   Legal Principles

A district court court's review of the Commissioner's decision is limited to determining whether the decision as a whole is supported by substantial evidence in the record. *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005). Substantial evidence is defined in this context as relevant evidence which a reasonable person would accept as adequate to support the conclusion reached. *Williams v. Astrue*, 416 Fed. App'x. 861, 862 (11th Cir. 2011). In determining whether substantial evidence exists, the court must scrutinize the record in its entirety, taking into account evidence favorable as well as unfavorable to the Commissioner's decision. *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995); *Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988).

If the Commissioner's decision is found to be supported by substantial evidence, then the reviewing court must affirm the decision, even if proof preponderates against it. *Dyer*, 395 F.3d at 1210. It is not the place of the reviewing court to reweigh the evidence or substitute its judgment for that of the Commissioner. *Id.* This restrictive standard of review set out above, however, applies only to findings of fact. No presumption of validity attaches to the conclusions of law found by the Commissioner, including the determination of the proper standard to be applied in reviewing claims. *Brown v. Sullivan*, 921 F.2d 1233, 1236 (11th Cir. 1991); *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990). The failure by the Commissioner to apply the correct law or to provide the reviewing court with sufficient reasoning for determining that the proper legal analysis has been conducted mandates reversal. *Cornelius v. Sullivan*, 936 F.2d 1143, 1145-46 (11th Cir. 1991); *see Wiggins v. Schweiker*, 679 F.2d 1387, 1389 (11th Cir. 1982).

### 2.   Regulatory Framework

This case involves a review of Plaintiff's continuing disability in order to determine if she

remained eligible to receive benefits during a finite period of time. 20 C.F.R. § 404.1590(a). Social Security Regulations establish an eight-step evaluation process to determine whether a claimant's medical condition has improved or if a disability continues. *See* 20 C.F.R. § 404.1594(f). The first determination is whether the claimant is engaged in substantial gainful activity. If so, a finding of a disability status will end. § 404.1594(f)(1). If not the ALJ proceeds to step two. Here, the ALJ found that Plaintiff had not engaged in substantial gainful activity (R. 13).

At step two, it must be determined whether the claimant suffers from an impairment or combination of impairments which meets or equal the severity of an impairment listed in Appendix 1, Subpart P of Regulations No. 4. If so, the disability will be found to continue. § 404.1594(f)(2). In this case, the ALJ found that since December 19, 2012, Plaintiff has not had an impairment or combination of impairments which met or medically equaled the severity of an impairment listed in 20 CFR Part 404, Subpart P, Appendix 1. (R. 14).

At step three, the determination to be made is whether there has been medical improvement in the claimant's condition. § 404.1594(f)(3). Medical improvement is defined in the Regulations as any decrease in the medical severity of any impairment which was present at the time of the most recent favorable decision finding the claimant disabled. § 404.1594(b)(1). At step four, it must then be determined whether the improvement relates to the claimant's ability to do work. § 404.1594(f)(4). If it does, the analysis proceeds to step six. If there has not been medical improvement, the ALJ considers whether an exception to medical improvement applies. § 404.1594(d)(e). Here, the ALJ found that there had been medical improvement of Plaintiff's impairments, which related to her ability to work and moved directly to step six (R. 16-18).

At step six, if the medical improvement is shown to be related to the claimant's ability to work, the ALJ must determine whether the claimant's current impairments in combination are

severe. If the claimant's impairments do not significantly limit the claimant's ability to perform basic work activities, then the claimant is no longer disabled. 20 CFR § 404.1594(f)(6); *see also Rockhill v. Saul*, No. 19-14001-CIV, 2020 WL 1445621, at *8 (S.D. Fla. Feb. 7, 2020). Here, the ALJ determined that since December 19, 2012, Plaintiff continued to have severe combination of impairments (R. 18) but that those impairments were not sufficiently severe so as to significantly affect Plaintiff's ability to perform basic work (R. 18).

At step seven, the ALJ must assess the claimant's residual functional capacity based on the claimant's current impairments. 20 CFR § 404.1594(f)(7). The ALJ determined that Plaintiff has the residual functional capacity to perform light work (R. 18). At the last step, the ALJ must determine whether work exists that the claimant can perform, given the claimant's age, education, and residual functional capacity. If the claimant can perform other work and that work exists in significant numbers in the national economy, then the claimant is no longer disabled. If the claimant cannot perform other work, then the claimant's disability continues. § 404.1594(f)(8); 20 CFR § 416.994(b)(5)(vii); *see also Rockhill*, 2020 WL 1445621, at *8. The ALJ found that based on Plaintiff's age, education, and residual functional capacity, there were jobs Plaintiff could perform in the national economy (R. 28).

In a cessation of benefits case, the burden is on the Commissioner to prove that the claimant is no longer disabled as of the cessation date because the Plaintiff has experienced "medical improvement." *Olivo v. Colvin*, No. 6:16-cv-259-Orl-40JRK, 2017 WL 708743, at *2 (M.D. Fla. Jan. 30, 2017). *Soto, v. Comm'r of Soc. Sec. Admin.*, No. 5:19-CV-568-OC-MAP, 2020 WL 4048210, at *2 (M.D. Fla. July 20, 2020).

### III.    THE RECORD

#### 1.    Plaintiff's Testimony

The ALJ and Plaintiff's counsel questioned Plaintiff regarding her impairments and lifestyle (R. 45, 50). Plaintiff testified that at the time of the hearing she was 54 years old. Plaintiff had completed high school (R. 51). Plaintiff was not working at the time and could not recall the last time she worked, stating only that it had been several years ago since she had worked. Plaintiff's disability benefits ceased two or three years before the hearing.

Plaintiff was being treated by Dr. Enrique Serrano for epilepsy and neurological issues and she was taking medication to help her seizures (R. 52). Despite taking the prescribed medication, Plaintiff testified that she suffered from recurring seizures, experiencing a seizure on a weekly or biweekly basis (*id*.). Plaintiff experiences grand mal seizures, which cause her to lose consciousness; it can take her up to a whole day to fully recuperate (R. 59). Plaintiff also experiences petit mal seizures, which cause her to go into a daze for the length of the seizure and take a couple of hours to recover (R. 60).

Plaintiff testified that since she was found to be disabled in 2005, her symptoms have worsened. In addition to epilepsy, Plaintiff was diagnosed with hypothyroidism and high blood pressure (R. 54). Plaintiff is also borderline diabetic. Plaintiff was prescribed and takes medications for seizure disorder, ovarian polyps (which also controls diabetes), hypothyroidism, depression, and anxiety attacks. Plaintiff stated that initially the seizure medication (Keppra) prevented her from experiencing seizures, but later she began having seizures despite continuing to take her medication. In January 2013, Plaintiff was hospitalized for seven days after suffering four seizures in one day (R. 56). After her hospitalization, her doctor changed her medication but the new medication (Vimpat) did not rid her of seizures. Around the same time as her

hospitalization, Plaintiff also began seeking treatment and taking medication for mental health issues (R. 58).

Plaintiff testified that she had discontinued psychiatric treatment because Dr. Guerrero had passed away (R. 60). Plaintiff continued experiencing symptoms as a result of her depression, including panic attacks, constant crying, and loss of desire to get out of bed. Plaintiff does not have any hobbies and does not see the purpose of having any (R. 61).

Plaintiff has two children and lives with her 21-year-old daughter and Plaintiff relies on her for transportation (despite having a valid driver's license, Plaintiff cannot drive). Plaintiff's children financially support her, which makes her feel like a bother to her children (R. 61). Plaintiff's daughter and mother help her with household chores and cooking (R. 63). Plaintiff does not have a social life and avoids leaving her house because she fears that she will have a seizure (R. 62). Plaintiff cannot not watch much television or sit in front of the computer for too long as it affects her vison and causes her to feel pressure in her head, which her doctor told her was related to her epilepsy disorder.

### 2.  Vocational Expert's Testimony

Pedro Roman, the vocational expert ("VE"), also testified at the hearing. The VE noted that Plaintiff's file did not contain information regarding Plaintiff's employment history, notwithstanding he was familiar with the jobs that exist in the United States (R. 65). The ALJ presented the VE with four hypothetical situations.

First, the ALJ asked the witness whether jobs existed for a hypothetical claimant, with the same age, education, and work[1] as Plaintiff, who is able to occasionally lift and carry, push or pull 20 pounds and frequently able to lift and carry, push or pull 10 pounds, can stand or walk (with

---

[1] In her opinion, the ALJ noted Plaintiff did not have past relevant work experience (R. 13).

normal breaks) for a six hours, who does not suffer environmental or communicative limitations, can sustain attention and concentration for two hours, can use judgment related to simple and routine tasks, and who will have limited exposure to the public. The VE stated that such a hypothetical claimant could perform jobs in the work force, such as assembler of small products, cigar inspector, and ticketer (R. 67).

The ALJ posed a second hypothetical, asking the VE whether jobs existed for a hypothetical claimant with the same background as Plaintiff and under the same circumstances of the first hypothetical, but the claimant also suffers from chronic grand mal and petit mal seizures several times a week, and it takes a full work day to recover from the mal seizures and several hours to recover from the petit mal seizures (R. 68). The VE responded that such a claimant could not hold any job within the national economy, explaining that the time to recover from both types of seizures is more than what any employer would allow an employee to be off task (R. 68–69). The ALJ then asked the VE if there were jobs in the national job market for a person who suffers seizures only once a week and subject to the same recover times. The VE answered in the negative, explaining that weekly interruptions would be beyond what any employer would permit (R. 69). The ALJ posed another hypothetical based on Plaintiff's physical limitations identified by her primary care physician as a result of the frequency of her seizures, asking the VE if there were jobs available for a person that cannot climb, balance kneel, or crawl; and who must avoid heights, moving machinery, chemicals, noise, fumes, and moderate exposure to vibrations and humidity (R. 69). The VE testified that there were no jobs that hypothetical claimant could perform (R. 70). Lastly, the ALJ posed a fourth hypothetical based on Plaintiff's psychiatric limitations as identified by Dr. Guerrero, Plaintiff's treating psychiatrist, asking the VE whether a job existed in the United States for a claimant that had severe limitations in the activities of daily living, social functioning,

remembering and carrying out detailed instructions, keep to a schedule, maintain regular attendance, and the ability to make simple work-related decisions (R.70). The VE did not believe such claimant could perform any job within the United States economy (R. 71).

### 3.  Summary of Relevant Medical Evidence

#### a.  John Cintron, M.D.

Plaintiff was treated by Dr. John Cintron, neurologist, from July 14, 2009 through July 27, 2014. On October 12, 2012, Dr. Cintron examined Plaintiff. His treatment notes from that visit report that Plaintiff suffered from generalized convulsive epilepsy despite taking Keppra, and he diagnosed her as having epilepsy (R. 689). Plaintiff was negative for anxiety, depression, and sleep disturbances. On January 7, 2013, Plaintiff was seen by Dr. Cintron. It was noted that Plaintiff reported being hospitalized on January 5, 2013 because she had at least five seizures within a two-week span (R. 691). At the end of that visit, Dr. Cintron referred Plaintiff to an internal center for epilepsy and did not change the dosage of her medications (R. 693). Plaintiff reported seeking treatment at the referred center for epilepsy (R. 694). On March 4, 2013, Plaintiff returned to Dr. Cintron for a follow-up visit. Plaintiff reported that the doctor at the center for epilepsy started her on Vimpat and that she had one seizure since. Dr. Cintron diagnosed Plaintiff as suffering from epilepsy/pseudo seizures and generalized anxiety disorder (R. 696).

On May 20, 2013, Plaintiff returned for a follow up visit (R. 697). Plaintiff reported that when she stops taking Vimpat she has breakthrough seizures and that the seizures are significantly reduced when she takes the medication. She also reported experiencing drowsiness as a result of the medication. Plaintiff's diagnosis remained unchanged. During that visit, Dr. Cintron prepared a letter confirming that Plaintiff suffers from epilepsy and has frequent seizures that come without warning. He further noted that despite being on several medications, Plaintiff continued having

seizures and that there is no cure for her condition (R. 547).

On July 23, 2014, Dr. Cintron examined Plaintiff who reported still having occasional seizures, approximately one seizure per week (R. 705). Plaintiff had been unable to visit the epilepsy center because of a lack of transportation. Dr. Cintron diagnosed Plaintiff as suffering from epilepsy (R. 707). Dr. Cintron also completed a Medical Statement Regarding Seizures for Social Security Disability Claim (R. 686). Dr. Cintron marked that Plaintiff suffered from complex partial seizures and generalized tonic-clonic seizures, both occurring several times a week.

**b.  University of Miami Epilepsy Center (Meredith Lowe, M.D., Enrique Serrano, M.D., and Ramses Ribot, M.D.)**

Plaintiff began treatment at the University of Miami Neurology Center upon Dr. Cintron's referral. On February 14, 2013, Plaintiff was examined by Dr. Meredith Lowe (R. 549). Plaintiff reported that she has experienced seizures since the age of four and has continued having seizures into her adult life. Plaintiff reported experiencing weekly petit mal seizures, which consist of brief starring spells that last several seconds; as well as monthly convulsive seizures, which cause her to lose consciousness (R. 550). Plaintiff also reported that she does not go more than three months without experiencing a seizure. Dr. Lowe diagnosed Plaintiff with epilepsy (R. 549). On March 3, 2013, Plaintiff had an EEG performed at the neurology center, which yielded mildly abnormal results (R. 552).

Plaintiff continued her treatment at the neurology center with Dr. Enrique Serrano and Dr. Ribot. On December 3, 2015, Plaintiff was examined by Dr. Ribbot (R. 852). In his progress notes, Dr. Ribot noted that Plaintiff was still experiencing weekly petit mal seizures and monthly convulsive seizures (R. 856). Plaintiff reported that she had trouble securing transportation to various doctors and difficulties in paying for treatment and medications (R. 857). Dr. Ribot added a medication to Plaintiff's regimen and ordered EEG monitoring (R. 856).

On June 29, 2016, Dr. Serrano treated Plaintiff during a follow-up visit (R. 858). Plaintiff reported that she was doing "a lot better," and was experiencing seizures once every two to three weeks. Her EEG revealed left temporal neuronal dysfunction and cortical hyperexcitability, consistent with an increased risk of seizures (R. 859). Dr. Serrano informed Plaintiff that brain surgery could help treat her epilepsy; Plaintiff said she did not want to have brain surgery (R. 862). Dr. Serrano advised Plaintiff that she should avoid situations in which altered consciousness could put her life and the life of others at risk, including driving, being close to open fires, climbing ladders, and swimming. On October 17, 2016, Plaintiff returned for a follow-up visit and was administered a Generalized Anxiety Disorder ("GAD") test. Plaintiff scored 14 on the GAD test consistent with generalized anxiety disorder. In June 2017, Plaintiff's EEG revealed abnormal brain activity suggestive of cortical hyperexcitability and dysfunction in the left temporal region consistent with focal epilepsy (R. 878). Dr. Serrano noted that Plaintiff was having issues with her insurance (R. 876). Dr. Serrano also prepared a letter in support of Plaintiff's Medicaid application, in which he explained that Plaintiff is in treatment for focal epilepsy due to recurrent complex partial and secondarily generalized tonic clonic seizures (R. 786). Dr. Serrano noted that Plaintiff experience seizures without warning that can cause her to fall down and hurt herself (*id.*). Plaintiff is unable to maintain gainful employment because her seizure disorder has impaired her cognitive functions, particularly her ability memory processing, making it difficult for Plaintiff to learn new job tasks (*id.*).

### c. Luis Guerrero, M.D.

Dr. Luis Guerrero, psychiatrist, treated Plaintiff November 14, 2013 through December 5, 2014. On April 22, 2014, Plaintiff reported that she had been sleeping better and experiencing fewer panic attacks (R. 668). She also reported suffering a severe seizure in the month of April

resulting in her hospitalization. Dr. Guerrero noted that despite sleeping better, Plaintiff's anxiety and depression symptoms were worsening as they were occurring more intensely and frequently. Dr. Guerrero diagnosed Plaintiff with generalized anxiety disorder, major depressive disorder, and panic disorder, and recommended treatment at a clinic or outpatient center because Plaintiff was impaired to a degree affecting in interpersonal and occupational functioning (R. 669).

On June 16, 2014, Plaintiff's anxiety and depression symptoms slightly improved (R. 665). Plaintiff reported being hospitalized in May 2014 due to gallbladder problems which resulted in surgery. Upon examination, Dr. Guerrero noted that Plaintiff appeared sad and was minimally communicative and diagnosed her as suffering from generalized anxiety disorder, major depressive disorder, and panic disorder (R. 665). Dr. Guerrero recommended a clinic or outpatient treatment because Plaintiff's emotional disorder was affecting her interpersonal and occupational functioning (R. 666).

On July 18, 2014, Dr. Guerrero noted that Plaintiff showed minimal response to treatment and that Plaintiff's symptoms were getting worse. Plaintiff reported that she felt "so depressed," anxious, and tired; and that she had been experiencing frequent seizures, auditory hallucinations, and memory loss (R. 662). Plaintiff appeared sad and downcast, yet she was fully communicative and well groomed. Plaintiff's diagnosis and recommendation for treatment remained unchanged (R. 663). Later that month, Dr. Guerrero completed a Medical Statement Concerning Depression with Anxiety for Plaintiff's Social Security disability claim (R. 681). In the form, Dr. Guerrero indicated that Plaintiff had several symptoms including a loss of interest in almost all activities, hallucinations, generalized persistent anxiety, recurrent severe panic attacks (*id.*). Plaintiff had marked limitations in restriction of activities of daily and difficulty in maintaining social functioning; and had difficulty in concentrating and completing tasks in a timely manner (*id.*).

Plaintiff was completely unable to function independently outside her home due to panic attacks (R. 682). Dr. Guerrero also indicated the following work-related limitations: Plaintiff was moderately impaired with respect to the ability to remember locations and work procedures, carry out short and simple instructions, ability to ask for assistance, and ability to perceive normal hazards and take appropriate precautions (*id*.). Plaintiff was markedly impaired regarding her ability to understand simple work instructions, carry out detailed instructions, maintain a schedule or routine, ability to make simple work-related decisions, complete a normal work week without interruptions form psychological interruptions, ability to get along with co-workers and maintain socially appropriate behaviors, and ability to respond appropriately to changes in the work setting (*id*.). Plaintiff was extremely impaired in her ability to work in coordination and proximity of others without being distracted by them, interact appropriately with the general public, and set realistic goals or make plans independently of others (R. 683).

### d.  Melissa Frider-Vidal, LMHC

On May 28, 2013, Dr. Frider-Vidal, psychotherapist at the Institute for Family Therapy, submitted a letter confirming that Plaintiff was participating in psychotherapy lessons (R. 548). Plaintiff presented with symptoms of depression, including low motivation and energy, staying in bed for most of the day, excessive sleep, irritability, loss of appetite, and helplessness (*id*.). Dr. Frider-Vidal reported that Plaintiff was overwhelmed and unable to cope with minor stressors without experiencing panic attacks and isolation (*id*.).  Plaintiff's mental health issues are exacerbated by Plaintiff's poor physical health, which includes her ability to function independently and obtain employment (*id*.). Dr. Frider-Vidal recommended that Plaintiff continue treatment with her psychiatrist and continue attending psychotherapy session (*id*.).

### e.  Jose Diaz, M.D.

Dr. Diaz, internist, treated Plaintiff from September 9, 2006 through December 13, 2014 (R. 558-564). On July 30, 2014, Dr. Diaz completed a Medical Assessment of Ability to Do Work-Related Activities (Physical) (R. 727-730). Dr. Diaz indicated that Plaintiff is limited in that she should never lift or carry up to 10 pounds, climb, balance, crouch, kneel, and should avoid all exposure to heights, moving machinery, chemicals, noise, humidity, dust, temperature extremes, and fumes (*id*. at 727).  Dr. Diaz indicated Plaintiff can sit for up to one hour in an 8 hour-work workday and she cannot stand or walk at all in an 8-hour work day (*id.*). Dr. Diaz also noted that his medical findings are supported by Plaintiff's epilepsy and that her hands and feet are frequently affected by her impairments (feet are affected frequently, and hands are affected occasionally) (R. 728). Plaintiff's ability to sit, stand, walk, and use her hands and feet are affected by her seizure disorder (*id*.). Additionally, Plaintiff's ability to climb, balance, crouch, kneel, and crawl are affected by her seizure disorder (R. 729).

### f.  Faud Ashkar, M.D.

Dr. Faud Ashkar, endocrinologist, treated Plaintiff from June 22, 2005 through June 29, 2017. Dr. Ashkar diagnosed Plaintiff with hypothyroidism and noted that she had reported seizures and feeling depressed and anxious.

### g.  State Consultants

The record also contains two medical assessments completed by two State Agency review physicians, Debra Troiano, M.D., and Ronald Kline, M.D. (R. 460-64, 521-). On December 18, 2012, Dr. Troiano opined that Plaintiff is capable of occasionally lifting/carrying up to twenty pounds, and frequently lifting/carrying ten pounds, sitting and/or walking from about 6 hours in an 8-hour work day (R. 458). Dr. Troiano explained that Plaintiff had epilepsy and was morbidly

obese, and treating sources indicated that Plaintiff's seizures were controlled with medicine (*id.*). Earlier that year, Plaintiff reported that her seizures were controlled while she was on Keppra (R. 459). On April 15, 2013, Dr. Kline opined that Plaintiff is capable of performing light work, with the limitations that she should never climb and should avoid concentrated exposure to various hazards.

### 4. Administrative Law Judge's Decision

After reviewing the evidence and conducting the eight-step evaluation, the ALJ determined that Plaintiff was no longer disabled within the meaning of the Act (R. 28). The ALJ noted that in 2005 Plaintiff was determined to be disabled, and that date was the comparison point decision ("CPD") for purposes of determining whether Plaintiff was still disabled.

At step one, the ALJ found Plaintiff had not engaged in substantial gainful activity and Plaintiff had not reported any earnings since 1992 (R. 13).  At step two, the ALJ found that since December 19, 2012, Plaintiff had the following impairments: seizure disorder, small vessel cerebrovascular disease, thyroid disorder, obesity, generalized anxiety disorder, and major depressive disorder (R. 14). Plaintiff's impairments were "severe" within the meaning of Social Security Regulations because they cause more than a minimal limitation to Plaintiff's ability to perform basic work activities (*id.*). The ALJ also noted that the record evidenced diagnoses of diverticulitis, fibroids/polycystic ovarian syndrome, none of which were severe (*id.*). The ALJ determined that Plaintiff's impairments or combination of impairments did not meet or medically equal the criteria of an impairment listed in 20 CFR Part 404, Subchapter P, Appendix 1 (R. 14-16). At step three, the ALJ found that Plaintiff's impairments had medically improved, specifically that there had been improvement of Plaintiff's seizure disorder (R. 16), and at step four, that Plaintiff's medical improvements are related to her ability to work (R. 18), and thus, skipped step

16

five.

At step six, the ALJ determined that since December 19, 2012, Plaintiff has continued to have the severe impairments of small vessel cerebrovascular disease, thyroid disorder, obesity, generalized anxiety disorder, and major depressive disorder (R. 18). At step seven, the ALJ found that even with Plaintiff's severe impairments she had the residual functional capacity ("RFC") to perform light work (with few physical limitations) and noted that there is no manipulative, visual, or communicative limitations (R. 18). The ALJ also determined that Plaintiff is able to understand, remember, and carry out simple, routine and repetitive tasks and instructions, as well as able to respond to supervision and coworkers (R. 19). At the last step, the ALJ determined that Plaintiff could perform a significant number of jobs in the national economy:  small parts assembler, cigar inspector, and ticketer (R. 28-29). Plaintiff's request for review of the June 6, 2018 ALJ decision was denied by Appeals Council on April 19, 2019 and became final (R. 1). Plaintiff now seeks judicial review of the ALJ's decision in this case. Plaintiff has exhausted her administrative remedies and, as such, this case is ripe for review under 42 U.S.C. § 1383(c).

## IV.   DISCUSSION

On appeal, Plaintiff argues that the ALJ committed reversible error in denying Plaintiff's application for continuing benefits. Plaintiff contends that the ALJ erred in finding that Plaintiff's seizure disorder had medically improved and no longer met the severity requirements of Listing 11.02A. Plaintiff argues that the ALJ's decision is not supported by substantial evidence, as she gave little weight to Plaintiff's testimony about the worsening of her condition, improperly assessed the weight given to Plaintiff's treating neurologists, and erred by failing to call an expert witness to testify on whether Plaintiff's seizure disorder continued to meet the severity of Listing 11.02A (ECF No. 19 at 5, 10).  Plaintiff also challenges the ALJ's decision to assign limited weight

to the medical opinions of treating sources. Plaintiff also argues that the ALJ's finding that Plaintiff had the RFC to perform light work in the national economy is not supported by substantial evidence because the ALJ failed to accord sufficient weight to the medical opinions of Plaintiff's treating sources (*id*. at 17-20).

Defendant avers that substantial evidence supports the ALJ's denial of social security benefits. Particularly, Defendant argues that substantial evidence supports the ALJ's finding that there had been medical improvement to Plaintiff's seizure disorder and thus, the impairment no longer satisfied the severity of Listing 11.02A (ECF No. 24 at 5). Defendant also argues that the ALJ gave proper weight to all medical opinions and that the ALJ's RFC finding is supported by substantial evidence (*id*. at 11, 18). Lastly, the Defendant argues that the ALJ properly assessed and weighed Plaintiff's testimony regarding her subjective complaints (*id*. at 21).

Upon review of the record, I find that the ALJ erred by failing to compare the medical evidence supporting Plaintiff's prior CPD in finding that there had been medical improvement in finding that there had been medical improvement to Plaintiff's seizure disorder, which is dispositive on appeal and requires reversal and remand of the ALJ's opinion.

**1. The ALJ Did Not Apply the Correct Legal Standard When Finding That Medical Improvement Occurred.**

In determining whether a claimant has met a listing, "claimant must have a diagnosis in the Listings and must provide medical reports documenting that the conditions meet the specific criteria of the Listings…" *Jarrell v. Astrue*, No. 1:10-CV-137-MP-GRJ, 2011 WL 5118906, at *9 (N.D. Fla. Aug. 30, 2011), *report and recommendation adopted*, No. 1:10CV137/MP/GRJ, 2011 WL 5118897 (N.D. Fla. Oct. 28, 2011) (quoting *Wilson v. Barnhart*, 284 F.3d 1219, 1224 (11th Cir.2002)). A claimant's benefits cease when that claimant no longer meets a Listing such or in other words, "if there is substantial evidence that there has been medical improvements in the

claimant's impairments related to his [or her] ability to work, and the claimant is now able to engage in substantial gainful activity." *Quario,* 2019 WL 4051972, at *5 (quoting *Klaes v. Comm'r, Soc. Sec. Admin.*, 499 F. App'x 895, 896 (11th Cir. 2012)) (*per curiam*) (citations omitted); *see also Simone v. Comm'r of Soc. Sec. Admin.*, 465 F. App'x 905, 907 (11th Cir. 2012). A finding that there has been a decrease in medical severity must be based on an improvement in the symptoms, signs and/or laboratory findings associated with the claimant's impairments, which were present at the time of the most recent favorable medical decision that she was disabled ("CPD"). *Soto v. Comm'r of Soc. Sec. Admin.*, No. 5:19-cv-568-Oc-MAP, 2020 WL 4048210, at *2 (M.D. Fla. Jul. 20, 2020). This analysis requires the Commissioner to compare the medical evidence supporting the most recent final decision holding that the claimant is disabled with new medical evidence. *Klaes*, 499 F. App'x at 896. A cursory comparison is insufficient; the ALJ must actually compare the new evidence against the evidence upon which the claimant was previously found to be disabled. *Id.*

The ALJ's finding that there had been medical improvement to Plaintiff's seizure disorder is not sound as the ALJ did not apply the correct standard, which required her to compare Plaintiff's medical evidence at CPD to more recent medical evidence. *See Rodriguez v. Com'r of Soc. Sec.*, No. 616CV2110ORL28DCI, 2017 WL 6498087, at *3 (M.D. Fla. Nov. 30, 2017), *report and recommendation adopted,* No. 616CV2110ORL28DCI, 2017 WL 6507098 (M.D. Fla. Dec. 18, 2017) (finding that where ALJ did not compare medical records, the ALJ applied the incorrect legal standard for medical improvement). The Court notes that the administrative transcript on the docket does not contain the original or 2005 CPD decision. Considering the absence of medical records relating to the prior CPD and the absence of any description by the ALJ of such records, it is clear she did not examine the prior medical records in order to conduct the required

comparison. *See Senior v. Colvin*, No. 3:12-CV-589-J-12-JRK, 2013 WL 4781044, at *6 (M.D. Fla. Sept. 6, 2013) (reversing and remanding ALJ's decision for failure to compare medical evidence where the administrative transcript contained little or no evidence predating CPD).

Despite not having earlier evidence or prior decisions in the record, the ALJ found medical improvement had occurred on December 19, 2012 (the date Plaintiff's disability benefits ended) (R. 16). In reaching that conclusion, the ALJ relied on medical records from 2006 through 2015.

The earliest record the ALJ cites to is the result of a brain CT scan from October 5, 2006 ordered by Dr. Diaz (R. 17, 470). The ALJ notes that the CT scan was normal and that later scans also yielded normal results, however, the ALJ does not address whether the results from those scans demonstrated an improvement from scans relied on to find Plaintiff disabled on July 28, 2005. The ALJ also cited to the results of two EEG scans, the first from January 2013 and the second from November 2015, explaining that both scans yielded normal results (R. 17) without explaining whether at CPD Plaintiff's EEG scans had abnormalities. It could be the case that at CPD Plaintiff's CT and EEG scans also appeared normal before 2005 when her seizure disorder qualified under Listing 11.02A and Plaintiff was found to be disabled. Similarly, the ALJ based her decision on the reported frequency of Plaintiff's seizures in 2013 (petit mal seizures once a week and grand mal seizures at least once per month) (R. 17). However, the ALJ did not explain whether this frequency was less than the frequency experienced at CPD.

The lack of comparison of the CPD medical evidence with the more recent evidence had a direct effect on the ALJ's findings related to medical improvement, critically, the ALJ found Plaintiff no longer meets Listing 11.02A, a determination she reached by reviewing medical evidence post-dating the CPD by several years. The ALJ also discredited Plaintiff's testimony that there had been no medical improvement and that her condition had worsened because, the ALJ

reasoned, Plaintiff's testimony was inconsistent with medical evidence from after 2005.

Without reviewing earlier medical records, it is impossible for the ALJ to determine whether the disorder has worsened. Accordingly, the Court cannot review whether the ALJ's finding of medical improvement is supported by substantial evidence. *Senior*, 2013 WL 4781044 at *7; *see also Klaes*, 499 F. App'x at 897 (reversing and remanding the ALJ's termination of benefits opinion for failure to compare medical evidence from the first time plaintiff was found disabled to more recent evidence in the record); *see also Soto*, 2020 WL 4048210, at *3 (reversing and remanding ALJ's decision for failure to compare medical evidence, noting that the ALJ's mentioning of the plaintiff's CPD does not equate to a comparison of the original medical evidence to the new medical evidence required to make a finding of medical improvement).

Defendant cites to *Johnson v. Comm'r, Soc. Sec. Admin.*, 618 F. App'x 544, 548 (11th Cir. 2015), in support of his position that the ALJ's finding of medical improvement is supported by substantial evidence. However, that case is distinguishable because the district court noted that the ALJ extensively reviewed all of the medical evidence in the record, including evidence and testimony at the initial and supplemental hearings before the ALJ. *See Johnson v. Colvin*, No. 1:13-CV-67-GRJ, 2014 WL 11392897, at *7 (N.D. Fla. Sept. 26, 2014).

Defendant similarly cites a plethora of evidence the ALJ relied on in reaching its determination, however, Defendant does not refute the ALJ's failure to compare the prior evidence related to the initial hearing and CPD. Accordingly, it is recommended that the Court reverse and remand the ALJ's decision for reconsideration at step three and comparison of medical evidence predating CPD and more recent medical data in the record to determine whether there has been a medical improvement to Plaintiff's seizure disorder.

The ALJ's determination at step three (whether there has been a medical improvement)

impacts the other steps of the ALJ's analysis. If after comparing earlier and more recent medical evidence, the ALJ determines that there has not been an improvement, then the ALJ must consider whether there are any exceptions to medical improvement at step five, and if there are no exceptions Plaintiff's disability continues and the analysis ends. Thus, at this juncture the Court should not determine whether the ALJ's remaining findings are supported by substantial evidence as it is likely that those findings may change on remand. *Rodriguez*, 2017 WL 6507098, at \*4 (reversing and remanding ALJ's opinion for failure to compare CPD medical evidence to more recent evidence and finding that review of remaining issues was not prudent in light of the impact of step three on the remaining analysis); *see also Senior*, 2013 WL 487481044 (reversing and remanding ALJ's opinion for failure to compare earlier medical evidence with more recent one on the record and to the extent the Court reviewed the remaining issues, the court held that both the plaintiff and ALJ could correct any errors on remand); *Spivey v. Berryhill*, No. 2:16-CV-681-GMB, 2018 WL 1546358, at \*7 (M.D. Ala. Mar. 29, 2018) (reversing and remanding ALJ's opinion without addressing the weight accorded to various medical opinions related to the plaintiff's seizure disorder where the ALJ's finding of medical improvement was not supported by substantial evidence as the ALJ did not compare the plaintiff's recent medical records to those of relied on in reaching CPD disability determination).

For these reasons, I recommend that Plaintiff's Motion for Summary Judgment be **GRANTED** on this ground and that Defendant's Motion for Summary judgment be **DENIED**.

## V.   CONCLUSION

The undersigned respectfully recommends that Plaintiff's Motion for Summary Judgment be **GRANTED** and Defendant's Motion for Summary Judgment be **DENIED**, and that the ALJ's decision be **REVERSED** and **REMANDED** with instructions to compare Plaintiff's medical

evidence at the initial hearing and CPD determination (July 28, 2005) and reanalyze steps three through eight of the Social Security Administration eight-step inquiry, including affording proper weight to the opinions of Plaintiff's treating sources.

Pursuant to Local Magistrate Rule 4(b), the Parties have fourteen (14) days from the date of this Report and Recommendation to serve and file written objections, if any, with the Honorable Federico A. Moreno, United States District Judge. Failure to timely file objections shall bar the Parties from *de novo* determination by the District Judge of any factual or legal issue covered in the Report and shall bar the parties from challenging on appeal the District Judge's Order based on any unobjected-to factual or legal conclusions included in the Report. *See* 28 U.S.C. § 636(b)(1); 11th Cir. Rule 3-1; *Patton v. Rowell*, 2017 WL 443634 (11th Cir. Feb. 2, 2017); *Cooley v. Commissioner of Social Security*, 2016 WL 7321208 (11th Cir. Dec. 16, 2016).

**RESPECTFULLY SUBMITTED** in Chambers this 30th day of July, 2020.

LAUREN LOUIS
UNITED STATES MAGISTRATE JUDGE